UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------- x
                                                          :
ELIZABETH ANN SUGER                                       :          3:08 CV 434 (PCD)
                                                          :
V.                                                        :
                                                          :
MICHAEL J. ASTRUE                                         :
COMMISSIONER OF SOCIAL SECURITY                           :          DATE: JULY 8, 2009
                                                          :
-------------------------------------------------------- x
```

RECOMMENDED RULING ON PLAINTIFF'S MOTION TO REMAND TO THE COMMISSIONER
AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE
COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g)

and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of

Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

I.  ADMINISTRATIVE PROCEEDINGS

On April 27, 2005, plaintiff, Elizabeth Ann Suger filed her application for SSI,

alleging an inability to perform substantial gainful activity[1] since April 1, 2005.[2]  (See

Certified Transcript of Administrative Proceedings, dated August 15, 2008 ["Tr."] 51-54;

see Tr. 158).  On December 5, 2005, plaintiff was granted SSI benefits beginning May 1,

---

[1]In her initial application, plaintiff claimed psychosis, bulimia and mental exhaustion limited her ability to work, and in her request for reconsideration, plaintiff articulated that she seeks DIB for her childhood developmental disorder and "psychotic eating disorder."  (Tr. 43, 170, 181; see Tr. 178-79).  However, in her application, she stated that she did not "practice" bulimia while she was working in 1990 to 1992, and the last episode was in July 2001.  (Tr. 179)

[2]In the Field Office report filed the same day as plaintiff's application, the SSA interviewer noted an alleged onset date of September 4, 2001.  (Tr. 165-68).  On October 28, 2005, plaintiff claimed disability since February 1, 1992, due to "emotional exhaustion," however, plaintiff did not stop working until April 14, 2000.  (Tr. 181)  It is not clear from the administrative record if this was a separate application or part of the initial April 2005 application.  (See Tr. 470).

2005.  (Tr. 158).  The Social Security Administration ["SSA"] denied plaintiff's claim for DIB both initially and upon reconsideration.  (See Tr. 35-47).  On May 12, 2006, plaintiff requested a hearing before an Administrative Law Judge ["ALJ"], and on April 19, 2007, such hearing was held before ALJ Eileen Burlison, at which plaintiff appeared without counsel.  (See Tr. 22-27, 34, 48-50, 431-79).   On June 1, 2007, ALJ Burlison denied plaintiff's claim.  (See Tr. 11-21).  On August 3, 2007, plaintiff requested review of ALJ Burlison's decision by the Appeals Council. (See Tr. 10).  On September 18, 2007, the Appeals Council denied plaintiff's request for review, rendering ALJ Burlison's decision the final decision of the Commissioner.  (See Tr. 6-8; see Tr. 5, 9).

Plaintiff filed her Complaint, pro se, on March 20, 2008 (Dkt. #3),[3] in response to which defendant filed his Answer on September 29, 2008. (Dkt. #32; see Dkts. ##29-30).[4]  Thereafter, on March 10, 2009, plaintiff filed her Motion to Submit Documents and her Motion to Remand to the Commissioner.  (Dkt. #39).[5]  On April 28, 2009, defendant

---

[3]Plaintiff commenced this action in forma pauperis on March 14, 2008.  (Dkts. ##1-3).  On April 11, 2008, plaintiff filed a Motion to Appoint Counsel (Dkt. #7), which was denied without prejudice seventeen days later.  (Dkt. #15).

On October 10, 2008, this Magistrate Judge ruled that after a "cursory review of the administrative record in this case, this case appears to [be] a case where the ends of justice are best served by the appointment of a pro bono attorney for plaintiff . . . ." (Dkt. #33, at 4). (quotations omitted).  Thereafter, on December 15, 2008, this Court appointed pro bono counsel for plaintiff, which order was vacated on January 23, 2008 at the request of both plaintiff and counsel.  (Dkts. ##37-38).

[4]Attached to defendant's Answer is a certified copy of the transcript of the record, dated August 15, 2008.  (Dkt. #32).

[5]Attached to plaintiff's motions are the following documents: copy of an information request for the Greenwich Housing Authority, file stamped October 18, 2005, at the bottom of which is a statement written by plaintiff and signed by Dr. Camacho, dated October 5, 2005; and an original of a Release Statement written and signed by plaintiff on November 19, 2008, and a Medical Care Provider Attestation, signed by Dr. William H. Hampton on November 19, 2008.

On May 5, 2008, plaintiff filed her first Motion to Remand to Commissioner (Dkt. #17), which, eighteen days later, she sought to redact and to attach two additional documents. (Dkt.

filed his Motion for Order Affirming the Decision of the Commissioner and brief in support. (Dkt. #40).   On March 27, 2008, Senior United States District Judge Peter C. Dorsey referred this case to this Magistrate Judge.  (Dkt. #5).

For the reasons stated below, plaintiff's Motion to Submit Documents and Motion to Remand to the Commissioner (Dkt. #39) is **denied in large part and is granted in limited part**[6] and defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #40 ) is **granted**.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1968 and is currently forty-one years old.  (Tr. 51, 84 439). Plaintiff has never been married and does not have any children. (Tr. 51).  Plaintiff lives with her mother, whom she describes as her "rent collection agent" or landlord.  (Tr. 55, 87; see also Tr. 73, 440).

Plaintiff attended Bryant College in Smithfield, Rhode Island from September 1986 through January 1990, completing eighty-one credits.[7]  (Tr. 136-37, 178, 185, 187, 209 439-41).[8]   According to plaintiff, she experienced social phobia and paranoia in college, but could not return home because her abusive father was still at home.  (Tr.

---

#19).  On August 18, 2008, plaintiff filed another Motion in which she sought to "[r]etract" these two previously filed Motions.  (Dkt. #28).  Plaintiff's Motion to Retract was granted on October 10, 2008, resulting in the withdrawal of Dkts. ##17 and 19.  (Dkt. #33).

[6]Plaintiff's Motion is granted in part to the extent that this Court will consider the documents submitted in support of her Motion.

[7]According to plaintiff, during high school, plaintiff reported physical and mental abuse in her home, which was investigated by the Department of Children and Youth Services.  (Tr. 185-86).  Plaintiff reports that she has suffered from battered child syndrome for more than three decades as a result of the extreme mental and physical abuse at the hands of her father. (Tr. 207).

[8]Plaintiff testified that she was 39 credits short of completing the required 120 credits.  (Tr. 440). Plaintiff also testified that she did very poorly at Bryant, failing many classes. (Tr. 453-55)

3

210).  Plaintiff left school in 1990 due to "illness" and an "emotional nervous breakdown" for which she was not hospitalized. (Tr. 441; see Tr. 185). After high school, plaintiff worked full time during summers between college semesters; plaintiff worked for Service America doing clerical work in 1986, and the following year plaintiff worked at a Macy's Department store, from which she left because she needed to rest.  (Tr. 66, 171, 182, 202, 213-14, 448-49).  Plaintiff claims that while working, the "psychotic effect of bi-polar tendencies took over." (Tr. 215).  In the summer of 1988, plaintiff worked as a "night guard" for her grandmother, to keep her from sleepwalking.  (Tr. 215, 449-50; see Tr. 419, 449).  After leaving college, plaintiff was employed full time at Cri Cri, a children's clothing store in Stamford, from 1990 until 1992, the last of those years in a managerial capacity. (Tr. 171, 182, 202, 216, 445-47; see Tr. 202, 421).[9]  In her job as a sales associate, plaintiff worked the register and carried the clothing on and off of the sales floor.  (Tr. 171-72, 182).  As an assistant manager, she closed the registers, accounted for the day's sales, and made bank deposits.  (Tr. 171, 182).  Plaintiff worked at Macy's from December 1999 until April 2000, when she left because she was exhausted, or because of harassment that she did not report.  (Tr. 66, 102, 170, 202, 421, 442-45).

According to plaintiff, she suffers from a mental health disorder, psychosis, and an eating disorder.  (Tr. 78, 96, 170).  As a result of her illnesses, plaintiff claims she is unable to work with people, her math skills have deteriorated, and she is unable to walk farther than her mailbox.  (Tr. 56).  She suffers from exhaustion and from "vivid violent disturbances," and she feels like she is being watched when she bathes or uses the

---

[9]Plaintiff testified that she was hired as a sales associate, but was given managerial responsibilities in 1991.  (Tr. 446).  Plaintiff said she did not "consider them to be managerial responsibilities" because the store was so small and everyone "did the same thing."  (Tr. 446-47).

restroom.   (Tr. 56, 74, 88).   Plaintiff states that worry about having her life on film "consumes" her, and she suffers from "quick onset manifestations of personal safety and well-being." (Tr. 74).  She suffers from nightmares, anxiety, and a lack of quality sleep, and she experiences "disruptions with ap[p]etite and taste sensations," and queasiness "occurs often." (Tr. 56, 74).  She reports that she does not like to discuss the impact her illness has on her as "[p]aranoia is a problem." (Tr. 88).

Plaintiff reports that she experiences "muscle pain up and down the spinal column," she experiences flu-like symptoms, and her condition affects her memory and her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, complete tasks, get along with others, understand, follow instructions, use her hands, and concentrate.  (See Tr. 60, 78, 93).  Her ability to pay attention "varies,"  she can follow instructions "well enough," particularly if they "seem logical[,] . . . non-combative" and written in the form of English plaintiff speaks and understands; she can handle stress "[p]retty well because [she has] all day to do it," but she fears "[l]ife, in general."  (Tr. 61, 79).[10]

Plaintiff's primary symptom is paranoia, which she describes as: "The misogynist world has created me to slowly torture me in order to define evil decision. Something about may[h]em scene, maim kin, witches, abortion etc."  (Tr. 96)(internal quotation omitted).  Plaintiff states that she feels like her life is on film, and she suffers from her symptoms all the time, although rest makes her feel better.  (Id.).

_____

[10]She completed her first Activities of Daily Living Questionnaire on May 5, 2005, her second on November 25, 2005, and her third on February 22, 2006.  In her 2006 responses, plaintiff reported that she does not know if she can follow instructions, "[she] do[es] not live by evaluations of attacks," she avoids stress as her "illness is enough stress," and she suffers from paranoia.  (Tr. 94).

According to plaintiff, an average day consists of eating, taking care of her cats, resting, preparing food, grooming, and completing paperwork to receive "proper disability benefits." (Tr. 55, 87; <u>see</u> Tr. 463). Plaintiff cares for her cats by providing "maintenance, security, prospective budgeting for healthcare costs, grooming, [and] psychological counseling regarding their possible future accom[mo]dations." (Tr. 55; <u>see also</u> Tr. 73, 87). Her mother purchases the cat food and feeds the animals. (Tr. 56, 74, 88). Plaintiff claims it takes her from ten minutes to one to two hours to prepare her three meals a day, which consist of bowls of cereal, salads, pasta or pizza. (Tr. 57, 75, 89). She reports that she does not use "the 27 year old shared (terrorized) refrigerator or the shared microwave."[11] (Tr. 75). When necessary, she shovels the driveway that she shares with her neighbor, and she hand washes her clothes, but she does not perform many household tasks because "exhaustion . . . arises quickly," and because she does not like using cleaning items purchased with other people's money. (Tr. 58, 76, 87, 91). Plaintiff goes outside often to check on the cats and retrieve the mail, she grocery shops once a week, and she walks or uses public transportation to get around. (Tr. 58-59, 76-77, 91, 463). Plaintiff used to drive but the "'road rage actions' from the other drivers," along with "[m]anifestations of [m]ental [h]ealth [i]llness" have caused her to stop driving. (Tr. 76, 91; <u>see</u> Tr. 463).[12] Plaintiff does not pay bills, nor does she

---

[11]Plaintiff elaborates that "all of the appliances are out of date and were paid for by an abusive revolting 'relative' who has ties, [she] believe[s], to a [misogynistic] terrorist organization that has to persecute [her] as long as it is permitted access to [her] life and activities that keep [her] alive . . . ." (Tr. 75).

[12]On March 29, 2007, plaintiff reported that she did not get her driver's license until she was thirty-three years old, because she had "always suffered from panic attacks when attempting to operate an automobile motor vehicle," and within two months of obtaining her license, she was involved in a one-car rollover accident. (Tr. 211). A year later she gave up her license "for medical reasons." (<u>Id.</u>).

manage a bank account as she reports that "[a]ny interaction with other people leaves a lot to be explained." (Tr. 59; but see Tr. 77, 92).[13]   According to plaintiff, it is better for her "to keep away from circulating currency and coins." (Tr. 92).  However, plaintiff also reports that she spends her days trying to "manage [her] financial life." (Tr. 73; see Tr. 77).  Her hobbies include playing Solitaire and Freecell, "trying to organize [her] future[,] find future housing possibilities[,] learn[ing] to use the food stamp program properly[, and] await[ing] word about SSI." (Tr. 59, 92).  Additionally, plaintiff claims that she is "trying to solve a negative discrimination and malpractice case involving [her] life as a diagnosed victim of [a] mental health disorder." (Tr. 77).  The only place that plaintiff visits regularly is the mailbox, and she has "no interest in maintaining any relationship with siblings or parents," as she describes herself as a "singular unit," having "cut off communications with former 'supposed relatives.'" (Tr. 60, 78).

Plaintiff took Risperdal, .5 mg, once daily, for her bulimia, but reported that she stopped taking it in June 2002; she takes Ibuprofen, 600 mg as needed. (Tr. 57, 75, 89, 97, 177, 188).  In 2005, plaintiff was prescribed Albuterol (Tr. 79), and in February 2006, plaintiff reported that she was wearing a brace/splint to walk. (Tr. 94).

Plaintiff has been actively involved in her attempt to obtain benefits from SSA, through her prolific letter writing. (See Tr. 64, 81-83, 99-100, 115-35, 140-51, 153-57, 189-99, 203-16, 401-30).[14]

---

[13]At the hearing, plaintiff acknowledged that her mother has a bank account that plaintiff is to access in the event of her mother's death. (Tr. 465-66).

[14]In her letter entitled, "My Knowledge With Regard to Public Welfare Programs for Individuals Unable to Earn Income, Permanent or Temporary Circumstances," plaintiff stated that her first hospitalization for her mental illness was in September 2001, though she had been unemployed since February 1992. (Tr. 118-19, 122-23, 195-96).  Plaintiff reported that her "torment of an experience" of questioning "why a personal terrorist and its throngs of devotees in

Plaintiff's medical records begin on September 4, 2001, on which date plaintiff was admitted to Stamford Hospital with a diagnosis of Psychotic Disorder NOS.[15]  (Tr. 231, 235; see Tr. 174).   In the emergency room, she was diagnosed with paranoia and referred for a psychiatric consult.  (Tr. 236-37; see Tr. 241-47).   The notes from that consult reveal that plaintiff reported that she "never had a [history] of psychiatric problems," but that she had decreased sleep and concentration since February of that year, and that currently, she was experiencing paranoid delusions, believing there were hidden recording devices in her apartment. (Tr. 238-39; see Tr. 248).  During her hospital stay, plaintiff was seen by Dr. Stephen Cooper[16] who described her as exhibiting "[v]ery, very extensive paranoid and psychotic ideation."  (Tr. 233; see Tr. 459).    Dr. Cooper reported plaintiff's mental status as "psychotic," with no past psychiatric history, and he treated her with Zyprexa, 5 mg. (Tr. 233).   According to Dr. Cooper, plaintiff reported a "long convoluted paranoid and psychotic history."  (Id.).  He diagnosed her on Axis 1: Bipolar, mixed.  (Id.).  Plaintiff was discharged on September 11, 2001, to "MHC," with Risperdal, 3 mg, and Tricleptal, 1000 mg.  (Tr. 232-34).[17]

------

the media outlets would not stop pursuing commenting on [her] life," began in December 2000 and became debilitating in February 2001.  (Tr. 130; see Tr. 122, 198).

Within her submissions to SSA is another copy of the documents submitted to this Court, including a signature of Dr. Camacho under a statement, written by plaintiff and directed to the U.S. Department of Housing and Urban Development, that states that plaintiff is "unable to earn an income in a manner healthy to [herself] and [she] suffer[s] from both mental and physical manifestations of [her] illness."  (Tr. 413-14; see Dkt. #39).

[15]Plaintiff was brought to the hospital by family members. (See Tr. 238).

[16]The discharge note from plaintiff's September 4-11, 2001 hospitalization contains a transcription error, in that Dr. Cooper noted that he first saw plaintiff on December 5, 2001, and that she was discharged on December 11, 2001.  (Tr. 233).

[17]Plaintiff testified that she was hospitalized "[u]ntil the supposed event September 11, 911 took place, in the year 2001. [She was] inclined to believe it was a television event and not a true

On January 8, 2002, plaintiff was admitted to the Dubois Crisis Center, which is part of the Southwest Connecticut Mental Health System, with a diagnosis of schizo-affective D/O bipolar type, and post-traumatic stress disorder; she had a GAF of 25.  (Tr. 343; see Tr. 340-46, 460-61).   Plaintiff reported that she was not taking her medications, and she discussed her "complicated delusional system involving 'evil manipulative men.'" (Tr. 340, 344-46).  The next day, on January 9, 2002, plaintiff was admitted to Stamford Hospital with a diagnosis of bipolar disorder, for which she was treated with Risperdal, 1 mg, and released nine days later with a referral to the Dubois Crisis Center in Stamford.[18] (Tr. 249-68; see Tr. 174-75).   During her stay, she was seen by Dr. Victoria L. Cressman; plaintiff reported that she did not follow up with treatment or medications after her last hospitalization, and that her "complexed delusional system," discussed at her earlier hospitalization, had escalated.  (Tr. 251).  Her diagnosis was changed from bipolar to psychosis.  (Id.).

On January 22, 2002, plaintiff began outpatient treatment which lasted thirteen days, with only four entries in that time period.  (Tr. 334-37).  A course of on-going therapy was recommended.  (See Tr. 335-36).  Plaintiff underwent therapy with a social worker through the Town of Greenwich's Department of Social Services from January 28, 2002 until April 2002 for treatment of her "delusional disorder."  (See Tr. 374).[19]

---

terrorist attack but [she does] not know. [She is] not the authority."  (Tr. 459).

[18]Plaintiff's mother contacted the "crisis team" to evaluate her daughter, and plaintiff was brought to the hospital by ambulance.  (Tr. 251).

[19]While such treatment was acknowledged by the social workers, no medical records were kept.  (Tr. 374-75).

On March 30, 2002, plaintiff was hospitalized in the Roanoke Community Hospital in Virginia following a car accident.  (Tr. 173).  Nine days later, plaintiff was admitted to Yale-New Haven Hospital, where she stayed from April 7, 2002 to April 10, 2002, after which she was transferred to the psychiatric unit in the Bridgeport Hospital where she stayed from April 10, 2002 to April 22, 2002.  (Tr. 173-74, 269-86; see Tr. 318-33, 347-55, 383-400).[20]  On April 7, 2002, while she was at Yale, plaintiff underwent a psychiatric evaluation in which she was described as "severe[ly]" delusional.  (Tr. 271; see Tr. 383-84).  She reported a history of mental illness, with a diagnosis of paranoid schizophrenia in September 2001; she reported that she was not taking any medication; and she stated that she had been on a three week train trip down the eastern seaboard so that she could get answers about the men "who were after [her]," which trip ended when her mother cancelled the credit card that plaintiff was using.  (Tr. 271-72, 275-76; see Tr. 319, 324-25, 385-87, 389-92).   When she called her sister to be picked up from the train station, her mother called the police.  (Tr. 271, 275; see Tr. 281-82, 319, 385-87, 389-90).  Plaintiff was diagnosed on Axis I of the DSM IV with Psychosis NOS, Axis IV with a history of abuse, and Axis V with a current GAF of 25, with a GAF of 35 in the past year.  (Tr. 274; see Tr. 279, 388, 391).  She was given Risperdal, 1 mg, and Ibuprofen, 400 mg.[21] (Tr. 280, 394).

Upon her admission to the psychiatric unit, plaintiff was diagnosed on Axis I with Psychosis D/O NOS, Axis III with a history of bulimia, Axis IV with "severe  - homeless,

---

[20]Plaintiff returned to her mother's home on April 23, 2002, without medication, but claimed that she had a two week supply in her possession.  (Tr. 319-21).  Plaintiff said she would follow-up with Greenwich Social Service.  (Tr. 320-21).

[21]Plaintiff complained of back pain from her earlier car accident.  (Tr. 272, 274, 285).

unemployed, conflicts [with] primary support group, uninsured," and Axis V with a current GAF of 25, with a past GAF of 35.  (Tr. 318).  Plaintiff was given Risperdal .5 mg for her "racing thoughts," and Colace 200 mg.  (Tr. 322).  Upon discharge, on April 22, 2002, plaintiff was diagnosed on Axis I with Psychotic D/O NOS, Axis III with a history of bulimia, Axis IV with "moderate - unemployed, conflicts [with] primary support group," and Axis V with a current GAF of 40,[22] and was told to follow up with Dr. Miller for psychiatric treatment, and with a case manager, Gaby Paul.  (Tr. 318, 322-23).

On May 14, 2005, plaintiff was scheduled to see a doctor at the Stamford Community Health Center ["SCHC"] (Tr. 174); however, her treatment records reflect her first appointment at SCHC was on May 20, 2005.  (Tr. 314; see Tr. 315-17).   Five days later, plaintiff reported that, along with other delusions that were not of a paranoid nature, she was hearing voices from the television or radio, and cameras were watching her.  (Tr. 312-13).  Dr. Camacho, a psychiatrist at SCHC, noted that plaintiff is unable to hold a job because of her somatic symptoms.  (Tr. 312).

On July 6, 2005, Dr. Camacho completed a Mental Status Questionnaire of plaintiff for SSA in which he noted that he first saw plaintiff on May 25, 2005.  (Tr. 287-89).  He assigned a diagnosis of "2989" on Axis I, and opined that plaintiff is capable of handling her own benefits.  (Id.).

Plaintiff was seen at SCHC on July 20, 2005, in which treatment note she was diagnosed with psychosis NOS, "probably paranoid," but she reported she was stable.  (Tr. 310).  Her "overall condition was a bit bizarre," and she was prescribed Risperdal 1 mg and psychotherapy. (Id.).

---

[22]During her in-patient treatment, plaintiff's GAF was rated 45, with 70 as the highest level maintained in the past year.  (Tr. 330).

On July 26, 2005, Jeffrey S. Cohen, PhD, completed an assessment of plaintiff for SSA.  (Tr. 290-92).  Plaintiff reported to Dr. Cohen that "things began bothering her" in December 2000, when she felt as though a group of people were attacking her from her computer, about which she became panicked.  (Tr. 290).  Plaintiff started to believe that messages were being sent to her from the radio and television, and she felt she was under surveillance from infrared cameras.  (Id.).  Plaintiff reported that after her first hospitalization, she tried to work in September through December 2001 at her mother's store, but she felt that people were coming into the store and wanting to attack her, and that she was being watched by video cameras.  (Tr. 291).  Dr. Cohen opined that there was evidence of ongoing psychotic disorder with delusions, and signs of schizophrenia, and that despite anti-psychotic medications, she continues to experience ongoing visual and auditory hallucinations.  (Tr. 292).  His diagnostic impression was as follows: Axis I: Schizophrenia, paranoid type, history of bulimia, in remission; Axis II: Deferred; Axis III: History of slight back injury secondary to motor vehicle accident; Axis IV: Psycho-social stressors are severe, occupational, economic, family, and social environment; and Axis V: GAF of 35. (Id.).

On August 17, 2005, Robert G. Sutton, PhD, completed a Psychiatric Review Technique of plaintiff for SSA in which he noted that plaintiff meets Listing 12.03, Schizophrenic, Paranoid and Other Psychotic Disorders, and is mildly restricted in her activities of daily living, has marked difficulties in maintaining social functioning, concentration, persistence or pace, and exhibits one or two episodes of decompensation, each of extended duration.  (Tr. 303; see Tr. 293-306).  Dr. Sutton reported that plaintiff has been "consistently psychotic across examinations" completed by Drs. Cohen and

Camacho, and Dr. Sutton opined that plaintiff's illness appears to be paranoid delusional d/o or paranoid schizophrenia.  (Tr. 305).[23]

Fourteen days later, plaintiff was described as remaining "guarded" in the SCHC treatment notes.   (Tr. 309).   In SCHC treatment notes dated September 14, 2005, plaintiff is described as paranoid schizophrenic, with delusional thinking and hallucinatory experiences.   (Id.).  She presented as withdrawn or isolated, and she reported that she feels discriminated or persecuted by Government agencies, who know everything about her before she evens knows.   (Id.).    Her insight was "markedly impaired," but she "continue[d] to offer resistance to proper treatment."   (Id.).

Plaintiff sent a letter to SCHC on October 26, 2005, in which she requested that her future appointments be made by mail only and not by telephone.  (Tr. 307).

On December 7, 2005, a Mental Status Questionnaire was completed for SSA in which plaintiff's diagnosis on Axis I of the DSM IV is listed as Chronic Paranoid Schizophrenia.  (See Tr. 356-58).  In a Psychiatric Review Technique completed two days later by Warren Lieb, PhD, Dr. Lieb opined that there is insufficient evidence to complete the medical portion of the disability determination.  (See Tr. 359-72).  Dr. Lieb noted that plaintiff's last insured date was September 30, 1995 and that there are no medical records prior to 2001.  (Tr. 371).[24]

_____

[23]Plaintiff's medical records include a "Chronic Medical List," from the Stamford Community Health Center, on which is recorded Risperdal, 1 mg and Cugentin .5 mg, taken on May 25, 2005, Risperdal 1 mg and Cugentin, taken on July 20, 2005, and Risperdal 1 mg, taken on September 14, 2005.  (Tr. 308; see Tr. 311).

[24]There is an unsigned, incomplete Psychiatric Review Technique in the transcript, which notes that there is no evidence of treatment prior to 2001.  (See Tr. 217-29).

On April 12, 2006, in a Case Analysis for SSA, Dr. Jerrold Goldman noted that he reviewed all of the evidence in the file, and there is "insufficient evidence in the MER to make a determination prior to the [date last insured] of September 30, 1995." (Tr. 373).

In a letter dated May 24, 2006, Rosalyn Klein, LCSW from the Town of Greenwich's Department of Social Services, noted that plaintiff "has a history of several years during which time she had been paranoid and delusional," and that she received treatment from her from January 2002 until April 2002. (Tr. 374). There are no medical records of that treatment. (See Tr. 375).

On November 18, 2006, plaintiff described herself as a "medically-needy mental healthcare patient" who was involved in "extensions of the horrifying and harrowing experience that could have turned into harm caused to the general public." (Tr. 130; see Tr. 122). In a letter dated December 11, 2006, Robert Pernice, MSW, LCSW, of Stamford Hospital, opined that "[a]lthough [plaintiff's] first psychiatric hospitalization occurred in September of 2001, . . . she suffered from an untreated psychiatric illness for many years, well in advance of her initial psychiatric admission," and she has been unable to work for "several years" due to her "severely impaired" "social/vocational functioning." (Tr. 381-82). Plaintiff's diagnosis as of December 2006 was delusional disorder, persecutory type R/O, and schizophrenia paranoid type. (Tr. 381).

On March 29, 2007, Pernice and Dr. Stephen Rachlin documented plaintiff's "current psychiatric diagnosis and treatment," in which letter they reference plaintiff's hallucinations, including her belief that she has been murdered "several times" during her life, and her paranoid ideation. (Tr. 402-03; see Tr. 404-05). While they state that plaintiff's impaired functioning is "supported by the fact that she has been unable to

sustain employment since 1992," her outpatient treatment with the authors began in June of 2006.  (Tr. 402; <u>see</u> Tr. 404).

_____On April 19, 2007, plaintiff testified at her hearing, without counsel,[25] before ALJ Burlison.  (Tr. 433; <u>see</u> Tr. 434-35).   Plaintiff testified that in addition to the medical treatment documented above, she received prescriptions for Risperdal from her uncle, Dr. Lawrence McReynolds, who lives in Colorado.  (Tr. 451-53).  According to plaintiff, she has been sick her entire life, since she was four years old, but her parents did not seek treatment for her, nor was she hospitalized until September 2001.  (Tr. 456-58).   Plaintiff testified that, at the time of the hearing, she was being treated by Dr. Rachlin, who she saw twice in six months, but that she was not on any medication.   (Tr. 461-62). According to plaintiff, she does not take medication because she has "been suffering from these symptoms [her] entire life and was never on medication[,] [a]nd now that [she is] an adult and can create her own environment . . . [and is] able to remain in what [she] consider[s] to be a stable condition," there is "no need to overcomplicate the situation with medication until it really becomes unbearable."  (Tr. 462).

When questioned about the existence of medical records prior to 1995, plaintiff acknowledged that the only records she has are "the history of [her] education and the abuse that [she] suffered," which she described as "medical records."   (Tr. 467). According to plaintiff, there are medical records from a hospitalization in 1969, when she was fifteen months old, for her ingestion of turpentine, which she cannot obtain without a subpoena because of their age, but as far as psychiatric records pre-dating 1995, none exist as she had "never been to a psychotherapist or anything like that."   (Tr. 467-68).

---

[25]Plaintiff was advised that she is entitled to representation but plaintiff felt that "representing [her]self [was] the proper way to go about handling this matter."  (Tr. 434).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).   Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id.  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically

determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

## A.  INSURED STATUS

For a claimant to be "insured" for disability benefits, she must, in any month, have had "not less than 20 quarters of coverage during the 40-quarter period which ends with the quarter in which such month occurred."  42 U.S.C. § 423(c)(1)(B)(I).  Further, to be entitled to disability benefits, a claimant must have been disabled at the time she filed her DIB application, or if not disabled at that time, her disability must have ended within the twelve month period before she applied.  20 C.F.R. § 404.315(a)(3).

## B. INQUIRY UNDER 20 C.F.R. § 404.1520

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 404.1520(a).  If the claimant is currently employed, the claim is denied.  See 20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her

former work.  See 20 C.F.R. § 404.1520(e).   If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.   See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

       C.  RESIDUAL FUNCTIONAL CAPACITY

The Commissioner may show a claimant's residual functional capacity by using guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

       D.  MENTAL IMPAIRMENTS

The Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See

Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

<u>IV.  DISCUSSION</u>

Following the five step evaluation process, ALJ Burlison found that plaintiff has not engaged in any substantial gainful activity since February 1, 1992, the alleged onset of her disability.  (Tr. 17; <u>see</u> 20 C.F.R. § 404.1520(a)(4)(ii) & (b)).  ALJ Burlison then concluded that the medical evidence supports a finding that the claimant suffers from a delusional disorder which is characterized as a severe impairment.  (<u>Id.</u>; <u>see</u> 20 C.F.R. § 404.1520(c)).  In the third step of the evaluation process, ALJ Burlison concluded that through September 30, 1995, the date through which plaintiff met the insured status requirements, plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 18; <u>see</u> 20 C.F.R. § 404.1520(d)).  According to the ALJ, after "careful consideration of the entire record," including consideration of opinion evidence and of all of plaintiff's symptoms to the extent they are consistent with the objective medical evidence, the deterioration of plaintiff's residual functional capacity, to prevent her performance of routine, retail work, did not occur earlier than September 2001, and through her last date insured, plaintiff was able to perform simple, routine, repetitive work that did not involve complex instructions, and was able to read, write, remember and understand instructions at, at minimum, a high school level.  (Tr. 18; <u>see</u> 20 C.F.R. §§ 404.1527, 404.1529; SSRs 96-2p, 96-4p, 96-5p, 96-6p, 96-7p).  In the fourth step of the evaluation, ALJ Burlison concluded that through her date last insured, plaintiff was capable of performing her unskilled past relevant work as a retail store worker.  (Tr. 20;

19

see 20 C.F.R. § 404.1565).  For the fifth and final step of the evaluation, ALJ Burlison concluded that plaintiff was not disabled prior to her date last insured, i.e., September 30, 1995, and accordingly, is not entitled to Title II benefits.  (Tr. 21; see 20 C.F.R. § 404.1520(f)).

Plaintiff now seeks an order remanding the decision of the Commissioner.  (Dkt. #39).[26]  In response, the Commissioner contends that in order for plaintiff to prevail on her  application for DIB, plaintiff must establish that her impairments reached disabling proportions on or before September 30, 1995, when her insured status expired, and that she became unable to perform the demands of her past relevant work, either as she performed it, or as it is ordinarily performed, prior to September 30, 1995.  (Dkt. #40, Brief, at 7).  The Commissioner argues that the ALJ's rejection of Dr. Rachlin's 2007 opinion as to plaintiff's condition prior to September 30, 1995, is supported by the record as there is no corroborating evidence of the existence of the symptoms plaintiff described to Dr. Rachlin ten years after the time period at issue, at a time when plaintiff was at her worst.  (Dkt. #40, Brief, at 9-10).

As stated above, plaintiff was granted SSI benefits as of May 1, 2005.  (Tr. 158).  Because plaintiff's insured status for DIB ended on September 30, 1995, she could not be eligible for DIB when she applied in 2005, leaving SSI benefits as the only benefits available should she be found disabled after September 30, 1995.[27]  In order to qualify for DIB, plaintiff must have been under a disability on or before September 30, 1995. (See 20

---

[26]Consistent with her contention during her hearing, plaintiff seeks to remand this case so that she may request a reasonable accommodation as a person with disabilities protected under the Americans With Disabilities Act of 1990. (Dkt. #39; Tr. 478).

[27]SSI benefits are not based on a recipient's prior work history, but rather are available to disabled individuals with little or no income.

C.F.R. § 404.1520(d)).  Further, in this case, plaintiff bears the burden of establishing that she cannot perform her former employment.  See 20 C.F.R. § 404.1520(e).

While the medical records, as addressed in detail above, clearly establish that plaintiff's presently suffers from a mental impairment, the hurdle plaintiff faces in this current appeal is that she does not have medical records establishing such disability prior to 2000-01.  During plaintiff's first hospitalization, on September 4, 2001, plaintiff reported that she "never had a [history] of psychiatric problems," and that she has had decreased sleep and concentration only since February of that year.  (Tr. 238-39).  During this first hospitalization, Dr. Cooper also observed that plaintiff had no past psychiatric history.  (Tr. 233).  Similarly, in a letter to SSA, dated September 18, 2006, plaintiff reported that her "torment of an experience" of questioning "why a personal terrorist and its throngs of devotees in the media outlets would not stop pursuing commenting on [her] life," began in December 2000 and became debilitating in February 2001.  (Tr. 130; see Tr. 122, 198).

In April 2002, while plaintiff was hospitalized at Yale-New Haven Hospital, her sister and brother-in-law reported that plaintiff "began having problems" in the latter half of high school, dropped out of college "suddenly," and had spent the past ten years "isolative," plaintiff nonetheless worked occasionally until the summer of 2000, when plaintiff began to feel as though people were "after her," and when she began "receiving special messages on the radio."  (Tr. 275, 277, 389, 391).  According to plaintiff, she experienced social phobia and paranoia in college, but could not return home because her abusive father was still at home.  (Tr. 210).  Plaintiff claims that she left college in 1990 due to "illness" and an "emotional nervous breakdown," even though after college, she

worked full time, eventually in a managerial capacity, at a children's clothing store, and then at Macy's, which job she left in April 2000 because she was exhausted.  (Tr. 66, 102, 170-71, 182, 202, 216, 421, 442-47).

On July 26, 2005, plaintiff reported to Dr. Cohen, an SSA examiner, that "things began bothering her" in December 2000, when she felt as though a group of people were attacking her from her computer, about which she became panicked.  (Tr. 290).  Plaintiff started to believe that messages were being sent to her from the radio and television, and she felt she was under surveillance from infrared cameras.  (Id.).  Plaintiff reported that after her first hospitalization, she tried to work in September through December 2001 at her mother's store but felt that people were coming into the store and wanting to attack her, and that she was being watched by video cameras.  (Tr. 291).

Further, there are two Psychiatric Review Technique reports in the file, one unsigned and incomplete, and the other completed on December 9, 2005 by Dr. Lieb; in both reports, the reviewers noted that there are no medical records prior to 2001.  (Tr. 217-29, 371).  Similarly, in a Case Analysis for SSA, dated April 12, 2006, Dr. Goldman stated that although he reviewed all of the evidence in the file, there is insufficient evidence to make a determination prior to September 30, 1995.   (Tr. 373).

In a letter dated May 24, 2006, Rosalyn Klein, LCSW from the Town of Greenwich's Department of Social Services, noted that plaintiff "has a history of several years during which time she had been paranoid and delusional"; plaintiff received treatment from Klein four years prior, from January 2002 through April 2002, although there are no records of such treatment in the transcript. (Tr. 374-75).

Despite the absence of medical records pre-dating 2000-01, in a letter dated December 11, 2006, plaintiff's social worker, Robert Pernice opined that "[a]lthough [plaintiff's] first psychiatric hospitalization occurred in September of 2001, . . . she suffered from an untreated psychiatric illness for many years, well in advance of her initial psychiatric admission," and she has been unable to work for "several years" due to her "severely impaired" "social/vocational functioning." (Tr. 381-82). On March 29, 2007, Pernice and Dr. Stephen Rachlin stated that plaintiff reported having "psychotic-like experiences as a young girl which may be understood as having occurred during a prodromal phase of a developing psychiatric illness." (Tr. 402; <u>see</u> Tr. 404). They opined that during college, plaintiff had a "formal eating disorder," and that her life "has followed the somewhat predictable course of mental illness, in which psychiatric symptoms are evidenced during childhood/adolescence, which then results in a gradual deterioration of social/vocational/educational functioning," which impaired functioning is "supported by the fact that she has been unable to sustain employment since 1992." (Tr. 402; <u>see</u> Tr. 404). Similarly, in an evaluation performed by APRN Janet S. D'Arcangelo on January 8, 2002 for the Southwest Connecticut Mental Health System (Tr. 344-46), Nurse D'Arcangelo observes that "[i]t is suspected that some [mental health] symptoms began to emerge" while plaintiff was in college. (Tr. 346).

Plaintiff testified that as of the time of the hearing, her treating physician was Dr. Rachlin, who she saw twice in six months.   (Tr. 461-62).  When making a determination regarding Social Security disability benefits, "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with the other substantial evidence."  <u>Rosa v. Callahan</u>, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple

citations omitted); see 20 C.F.R. § 404.1527 (d)(2)(when the ALJ "fiind[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, . . . [the ALJ] will give it controlling weight."). "Generally, . . . more weight [is given] to opinions from . . . treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ."  20 C.F.R. § 404.1527(d)(2).

In this case, as plaintiff testified, she only saw Dr. Rachlin twice before he offered his opinion as to the longevity of plaintiff's illness, and his opinion is inconsistent with the medical evidence of record.[28]  Accordingly, the ALJ did not err in rejecting Dr. Rachlin's 2007 opinion.  Specifically, ALJ Burlison noted the limited nature of Dr. Rachlin's involvement with plaintiff, the fact that Dr. Rachlin did not begin treating plaintiff until June 2006, after she requested a hearing before an ALJ, that plaintiff refused to take psychiatric medication under Dr. Rachlin's care, which medication helped stabilize plaintiff in the past,[29] and that Dr. Rachlin's conclusions that plaintiff's symptoms in 2006 dated

---

[28]"Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairments . . . ."  20 C.F.R. § 404.1527(a)(2). To determine the weight that is assigned to a medical opinion, the Regulations identify the following factors as relevant:  (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; if it is, it is accorded greater weight; and (5) other relevant but unspecified factors.  20 C.F.R. § 404.1527(d).

[29]Plaintiff testified at her hearing that she does not take medication because she has "been suffering from these symptoms [her] entire life and was never on medication[,] [a]nd now that

back to 1995, were not supported by clinical data or the medical evidence in the record. (Tr. 19). Further, although it may be the case, as Dr. Rachlin and Pernice opined, that plaintiff's psychiatric illness developed over the course of her life, in order for plaintiff to qualify for disability insurance benefits, plaintiff must establish the existence of her severe mental impairment prior to her last date insured.  Factors critical to determining whether plaintiff was disabled on or before September 30, 1995 include, among others, "objective medical facts and clinical findings, [and] diagnoses and medical opinions of examining physicians . . . . "  Carroll v. Secretary of HHS, 705 F.2d 638, 642 (2d Cir. 1983)(multiple citations omitted).   Unfortunately, without the objective medical records for the time period prior to and including September 30, 1995, plaintiff cannot sustain her burden of establishing the existence, of what, at this point in her life, clearly is a severe mental impairment.  The observations of plaintiff's sister and mother, as well as a nurse based on one evaluation, that plaintiff "began having problems" or that "[i]t is suspected that some symptoms began to emerge" during the last two years of high school or during college,

---

[she is] an adult and can create her own environment . . . [and is] able to remain in what [she] consider[s] to be a stable condition," there is "no need to overcomplicate the situation with medication until it really becomes unbearable." (Tr. 462).

During plaintiff's January 2002 hospitalization, she reported to Dr. Victoria Cressman that she did not follow up with treatment or medications after her last hospitalization, and since that time, plaintiff's "complexed delusional system," had escalated.  (Tr. 251).

Similarly, plaintiff's three week trip down the eastern seaboard that precipitated her April 7, 2002 hospitalization, occurred while plaintiff was not taking any medication. (Tr. 271-72, 275-76; see Tr. 319, 324-25, 385-87, 389-92).

do not constitute clinical data or medical evidence.  (Tr. 277, 346, 391, 416).[30]  Nothing in this Ruling alters plaintiff's receipt of SSI benefits, for which she is so clearly eligible.

### V.  SPECIAL OBLIGATION TO PRO SE  CLAIMANTS

Less than two weeks ago, the Second Circuit issued its ruling in Moran v. Astrue, No. 07-1728-CV, 2009 WL 1767634 (2d Cir. June 24, 2009), in which it re-emphasized an ALJ's duty to give a pro se Social Security claimant/plaintiff sufficient assistance at the hearing in developing a record of critical events.  In Moran, the pro se claimant had filed applications for benefits in September 1980, August 1986, and April 1987, all claiming a disability commencing on September 1, 1980; all three applications were denied.  Id. at *1.  His fourth application, filed in March 1991, was granted, finding that plaintiff became disabled as of that month.  Id. at *2.  Here, the Second Circuit remanded the case for rehearing, finding "the ALJ's conduct especially problematic[,]" given that "[u]nlike disability claimants who have yet to be adjudicated disabled, Moran was–and the ALJ knew him to be–conclusively and unquestionably disabled with a constellation of debilitating and degenerative . . . ailments[,]" as well as "severe, diagnosed problems with anxiety, [and] difficulties in relating to people[,]" for "more than ten years prior to the hearing at issue."  Id. at *4 (footnote omitted).  The Second Circuit observed that "[t]hese varied difficulties may help explain his somewhat diffuse testimony at the hearing."  Id.  In Moran, the ALJ had relied upon the plaintiff's employment in an orchard in 1985 and 1989 as evidence of "substantial gainful employment," without inquiring

---

[30]The medical records, as discussed in Section II. supra, do not support any physical limitations, and consequently, support a finding that plaintiff was capable of performing her unskilled past relevant work as a retail store worker through September 30, 1995.  (20 C.F.R. § 404.1565; see Tr. 20-21).  This conclusion is supported in part by the fact that plaintiff remained employed as a retail sales associate twice during the period of  September 1990 through April 2000.  (Tr. 66, 102, 107-71, 182, 202, 216, 421, 442-47; see Tr. 202, 421).

whether this work was performed under "special conditions." Id. at *4.  The Second Circuit thus held that "[i]n light of the meager record and Moran's manifest debilitating condition, it was especially important for the ALJ to help Moran develop a testimonial record of the critical events–even if those events were in the distant past." Id.  Because "the ALJ rendered little assistance[,]" the Second Circuit remanded the case for the ALJ to "develop[ ] a more comprehensive record," even though it was "reluctantly prolong[ing] a case that is now almost thirty years old." Id. at *4-5.

In some respects, the procedural history here parallels that in Moran, in that plaintiff here already had been awarded SSI benefits, so that she, like Moran, was "unlike disability claimants who have yet to be adjudicated disabled," but as the ALJ knew, plaintiff was "conclusively and unquestionably disabled with a constellation of debilitating . . . ailments . . .," as well as "severe, diagnosed [psychiatric] problems . . . [including] difficulties in relating to people." Id. at *4 (footnote omitted).  As in Moran, "[t]hese varied difficulties may help explain [her] somewhat diffuse testimony at the hearing." Id. However, unlike Moran, whose employment in an orchard in 1985 and 1989 could well have been employment under "special conditions," id. at *4, after leaving college, plaintiff was employed full time at Cri Cri, a children's clothing store in Stamford, from 1990 until 1992, the last of those years in a managerial capacity. (Tr. 171, 182, 202, 216, 445-47; see Tr. 202, 421).[31]  In her job as a sales associate, plaintiff worked the register and carried the clothing on and off of the sales floor (Tr. 171-72, 182); as an assistant manager, she closed the registers, accounted for the day's sales, and made bank deposits.  (Tr. 171, 182).  After a seven-year hiatus, plaintiff worked at Macy's from

---

[31]See note 9 supra.

December 1999 until April 2000, when she left either because she was exhausted, or because of harassment that she did not report.  (Tr. 66, 102, 170, 202, 421, 442-45). There is nothing about these two jobs that even remotely suggests that they were performed under "special conditions," about which ALJ Burlison should have make specific inquiry.[32]

Moreover, unlike the ALJ in <u>Moran</u>, ALJ Burlison explicitly advised plaintiff that the time frame from 1992 through September 30, 1995 was "the period that [the ALJ is] specifically interested in."  (Tr. 453).  ALJ Burlison directed questions to plaintiff regarding her mental health issues and treatments from 1992 and 1995, to which plaintiff responded that she has been "sick with [her] entire life," starting at four years old in 1972, reflected by junior high school grades that were "abominable," but that she was not treated or hospitalized for her mental health issues until 2001, because "[t]hat [was] up to my parents and they did not hospital [her]" or have her treated.  (Tr. 455-57).  ALJ Burlison continued to inquire about plaintiff's years at Bryant College, and plaintiff similarly responded that while she "just laid in bed and went through [her] emotional breakdown," she was never hospitalized because "[n]o one told [her that she] should be hospitalized," nor did her parents seek treatment for her.  (Tr. 457).  ALJ Burlison then asked plaintiff about the years from 1989 through 1995, and again plaintiff testified that she was not hospitalized until 2001.  (Tr. 457-58).   Later in the hearing, ALJ Burlison again asked plaintiff if she had any treatment records prior to 1995, as to which plaintiff responded there are none, other than her school records and her poisoning from

---

[32]For these reasons, the Court has placed no emphasis on plaintiff's job during the summer of 1998, when she was employed as a "night guard" to prevent her grandmother from sleepwalking (Tr. 215, 419, 449-50), and immediately after her first hospitalization, when she tried to work at her mother's store, from September through December 2001.  (Tr. 291).

turpentine in 1969, when she was a toddler.  (Tr. 467-68).  When ALJ Burlison asked a second time whether "there [are] any other records pre-1995 that might be pertinent . . .," plaintiff answered, "No. . . . I've never been to a psychotherapist or anything like that," although she did request family therapy in 1990 and "was turned down." (Tr. 468). Thus, unlike Moran, ALJ Burlison, on several occasions during the hearing, attempted to solicit information from plaintiff regarding the critical time period of 1992 through 1995, and repeatedly was told by plaintiff that there are no such records.  There was nothing more ALJ Burlison could do in the absence of the necessary records.

## VI. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion for Remand or Reversal (Dkt. #39) is **denied in large part and is granted in limited part**,[33] and defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #40) is **granted**.

The parties are free to seek the district judge's review of this recommended ruling.  See 28 U.S.C. §636(b)**(written objection to ruling must be filed within ten days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

---

[33]See note 6 supra.

Dated at New Haven, Connecticut, this 8th day of July, 2009.


/s/Joan Glazer Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge